1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

11
12

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

13
14
15
16

**TODD COHN,** individually and on behalf of all others similarly situated**,**

**Case No.**

17
18

Plaintiff

**JURY TRIAL REQUESTED**

19

v.

20
21
22

**UNIVERSAL PICTURES HOME ENTERTAINMENT, LLC, d/b/a GRUV.COM,** a Delaware Limited Liability Company

23
24

Defendant.

25
26
27
28

Plaintiff Cohn, on behalf of himself and all others similarly situated, files this Class Action Complaint against Defendant, Universal Pictures Home Entertainment, LLC d/b/a/ Gruv.com ("Defendant" or "Gruv") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA").

## NATURE OF THE ACTION

1.     This is a privacy class action lawsuit, brought under Federal Rule of Civil Procedure 23 against Gruv seeking statutory damages, civil penalties, restitution, disgorgement of profits, declaratory relief, public injunctive relief, and reasonable attorneys' fees and costs pursuant to the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA").

2.     Defendant develops, owns, and operates www.gruv.com ("Gruv.com"), which sells prerecorded movies and television series to customers in the U.S.[1] The website features thousands of prerecorded videos available on DVDs, Blue rays, and via digital codes that consumers can use to stream the prerecorded videos. On its website, Gruv also offers customers the option to sign up to receive notices and special promotions.[2]

3.     Federal law recognizes, through the VPPA, that our video-viewing habits are intimately private. The law accordingly requires companies that rent, sell, or deliver prerecorded video materials to maintain their customers' privacy and prohibits, among other things, the knowing disclosure of customers' video material choices to any third party without the customers' specific advance written consent.

4.     Despite its clear legal obligations under federal law, Defendant knowingly and intentionally discloses its customers' personally identifiable information, including their personal identifiers and a record of every DVD, Blu-ray, and/or digital video code they requested ("Personally Identifiable Information" or "PII") to a third party, Meta Platforms Inc. (formerly known as

---

[1] *See* https://www.Gruv.com (Last visited January 8, 2025).
[2] *See* https://www.Gruv.com/account (Last visited January 8, 2025).

Facebook) ("Meta" or "Facebook") through the use of the Meta Pixel, without its customers' consent or knowledge.

## PARTIES

5.      Plaintiff is, and has been at all relevant times, a resident of Boca Raton, Florida. In or about January 5 and January 9, 2025, Plaintiff requested (by clicking on video titles and by placing videos in his checkout cart) and purchased movies from www.gruv.com. Throughout the time that Plaintiff requested and purchased prerecorded DVDs and Blu-ray discs on Defendant's website, he had a Facebook account and he used it frequently throughout that period.

6.      Defendant Universal Pictures Home Entertainment, LLC d/b/a/ Gruv.com is a Delaware Limited Liability Company, with its principal place of business in Universal City, California.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the proposed Class (defined below) exceeds $5,000,000 exclusive of interest and costs, there are more than 100 members of the putative class, and minimal diversity exists because a significant portion of putative class members are citizens of a state different from that of Defendant.

8.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

9.      This Court has personal jurisdiction over Defendant and venue is appropriate in this District because Defendant and the Plaintiff have agreed under Defendant's Terms of Service, that "any action or proceeding arising from, relating to or in connection with these TOS will be brought exclusively in the federal or state courts located in New York County, New York, and you irrevocably consent to the personal jurisdiction of such courts…"[3]

---

[3] See https://www.nbcuniversal.com/terms (Last viewed January 15, 2025).

# FACTUAL BACKGROUND

**I.   Gruv Provides Video Tape Services to Plaintiff and its Other Customers.**

10.     Gruv operates www.gruv.com, which sells physical and digital format of movies and TV shows.  Consumers can purchase prerecorded videos on DVDs, Blu-rays and via digital codes that provide access to prerecorded videos.[4]

11.     Gruv's website offers thousands of pre-recorded videos for sale.

12.     Gruv's website also encourages and permits consumers to sign up for notices about videos, including notices of promotions.

13.     Once a customer purchases a prerecorded DVD or Blu-ray video, Defendant ships the purchased DVD or Blu-ray video to the customer.[5]

14.     If a customer purchases a digital code, Defendant sends a digital code to the customer via email.  The customer is directed to visit "Movies Anywhere" – at the website www.moviesanywhere.com and to enter or "redeem" the digital code in order to be able to watch the purchased prerecorded video.[6]

15.     Thus, Defendant is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4) because it is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."

16.     And, Plaintiff and other customers are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1) because they are "renter[s], purchaser[s], or subscriber[s] of goods or services from a video tape service provider."

17.     Plaintiff and other customers are "purchasers" of goods or services from a video tape service provider – namely Gruv – because they purchased prerecorded videos from Defendant in the form of DVDs, Blu-rays and/or digital codes.

---

[4] *See* https://www.gruv.com/ (last visited on January 8, 2025).
[5] *See* https://www.gruv.com/basket (last visited January 8, 2025).
[6] *See* https://www.gruv.com/category/gruv_digital (last visited January 8, 2025).

## II.  Gruv Has Maintained a Meta Pixel on Its Website Throughout the Class Period

18.    On information and belief, Defendant first implemented the Meta Pixel on its website beginning in or about December 2021 and continues to maintain the Meta Pixel on its website at present.

19.    According to the FTC: "Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings."[7]

20.    Meta, which operates Facebook and was called Facebook, Inc. until changing its name in January 2022, is the world's largest social media company. Meta reported having 2.04 billion daily active users as of March 2023,[8] and reported $116.61 billion in revenue in fiscal year 2022.[9]

21.    Meta's current revenue, as well as its revenue when the company was called Facebook, Inc., has been derived almost entirely from selling targeted advertising to Facebook users, users of its family of apps including Instagram, and internet users on non-Facebook sites that integrate Meta marketing source code on their websites. Meta reported in Fiscal Year 2022 that its revenue from advertising was over $113 billion and Meta stated that it "generated substantially all of our revenue from selling advertising placements on our family of apps to marketers."[10] In its 10k filing

---

[7] *See* https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (citing M. Eddy. "How Companies Turn Your Data Into Money." PC Mag. October 10, 2018. https://www.pcmag.com/news/how-companies-turn-your-data-into-money) (last visited Dec. 10, 2024.)

[8] Meta Reports First Quarter 2023 Results, https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-First-Quarter-2023-Results-2023.pdf

[9] Meta Reports Fourth Quarter and Full Year 2022 Results, 2/1/23, https://s21.q4cdn.com/399680738/files/doc_financials/2022/q4/Meta-12.31.2022-Exhibit-99.1-FINAL.pdf (last visited Oct. 28, 2024).

[10] Meta, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2022, https://www.sec.gov/Archives/edgar/data/1326801/000132680123000013/meta-20221231.htm (last visited Dec. 10, 2024).

covering the fiscal year 2018, Facebook similarly admitted that, "We generate substantially all of our revenue from selling advertising placements to marketers."[11]

22.     Facebook describes itself as a "real identity platform,"[12] meaning users are allowed only one account and must share "the name they go by in everyday life."[13]  Therefore, when users create an account, they must provide their first and last name, along with their birthday and gender.[14]

23.     Facebook sells advertising space by highlighting its ability to target users.[15] Facebook can target users so effectively because it surveils user activity both on and off its site.[16] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "Connections".[17] Facebook complies this information into a generalized dataset called "Core Audiences", which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[18]

24.     Advertisers can also build "Custom Audiences."[19] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have visited [their] website."[20] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to

---

[11] Facebook, SEC 10k filing for the Fiscal Year Ending Dec. 31, 2018.
https://www.sec.gov/Archives/edgar/data/1326801/000132680119000009/fb-12312018x10k.htm.
[12] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[13] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY,
https://www.facebook.com/communitystandards/integrity_authenticity.
[14] FACEBOOK, SIGN-UP, http://www.facebook.com/
[15] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.
[16] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[17] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[18] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.
[19] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494
[20] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.

find new people who share similar qualities."[21] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[22] One such Business Tool is the Meta Tracking Pixel.

25.    The Meta Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[23] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

26.    Advertisers control what actions—or, as Facebook calls it, "events"—the Meta Tracking Pixel will collect along with what pages a visitor views and what buttons a visitor clicks.[24] Advertisers can also configure the Meta Tracking Pixel to track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[25]

27.    An advertiser can also create their own tracking parameters by building a "custom event."[26]

28.    Advertisers control how the Meta Tracking Pixel identifies visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[27]

---

[21] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[22] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494.
[23] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[24] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[25] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[26] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[27] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

Http Headers collect "IP Addresses, information about web browser, page location, document, [referrer] and persons using the website."[28] Pixel-specific Data includes "the Pixel ID and cookie."[29]

29.    FTC Commissioner Rohit Chopra addressed the harms that can be caused by sharing information with Facebook when he stated in 2019, "Because behavioral advertising allows advertisers to use mass surveillance as a means to their undisclosed and potentially nefarious ends, Facebook users are exposed to propaganda, manipulation, discrimination, and other harms. . . . Facebook's massive, private, and generally unsupervised network of advertisers has virtually free rein to microtarget its ads based on every aspect of a user's profile and activity. The company's detailed dossiers of private information includes things like a user's location and personal connections, but it also includes the history of everything a user has ever done wherever Facebook is embedded in the digital world."[30]

### III.    Gruv Knowingly and Intentionally Sends Plaintiff's and Other Customers' Personally Identifiable Information (PII) to Meta

30.    As stated above, beginning in or about December 2021 and continuing to the present, Defendant has maintained the Meta Pixel on its website and transmitted Plaintiff's and other customers' personal information, including personal identifiers, and records of the video titles they view and/or purchase, including information which identifies them as having requested or obtained specific video materials or services, without their consent, to Meta in accordance with the Meta Pixel's configuration.

31.    When Plaintiff or other customers visited Defendant's website, the Meta Pixel automatically caused the Plaintiff's or other customers' personal identifiers, including IP addresses and the c_user, _fr, _and datr cookies, to be transmitted to Meta, attached to the fact that the

---

[28] See id.

[29] See id.

[30] See Dissenting Statement of FTC Commissioner Rohit Chopra, In re Facebook, Inc., Commission File No, 1823109, July 24, 2019. https://www.ftc.gov/system/files/documents/public_statements/1536911/chopra_dissenting_statement on facebook_7-24-19.pdf.

Plaintiff/customer had visited the website, and the titles of the videos the Plaintiff/other customer clicked on, placed in their cart, and/or purchased.

32.    The cookies that were transmitted as a result of the Meta Pixels that Defendant installed on its websites conveyed Plaintiff's and customers' Facebook IDs (through the c_user cookie), which can be used by Facebook and any ordinary person to find the user's real name, the specific and unique web browser from which the customer is sending the communication, and an encrypted combination of the information contained in those two cookies (fr cookie).

33.    The Meta Tracking Pixel hosted on Defendant's website transmits the above information because by transmitting information associated with the PageView, View Content and AddToCart events to Facebook.

34.    When a customer requests and selects a pre-recorded DVD, Blu-ray or digital video code on gruv.com, the PageView event and the ViewContent event transmit the Uniform Resource Locator ("URL") accessed, which contains the title ID ("Title ID") of the requested DVD, Blu-ray or streaming video, an example of which is shown in Figures #1 and #2 below:

///

**Figure #1**

 

**Meta Pixel Helper**
Learn More

---

One pixel found on www.gruv.com

---

 Meta Pixel

Pixel ID: 195980562385522 click to copy

Troubleshoot Pixel

Set up events

▼ ✓ PageView

**EVENT INFO**

**Setup Method**: Manual
**URL called**: Hide

```
https://www.facebook.com/tr/?id=195980562385522&ev=PageVie
w&dl=https%3A%2F%2Fwww.gruv.com%2Fproduct%2Fhouse_of_the_d
ragon_the_complete_first_season_dvd&rl=https%3A%2F%2Fwww.g
ruv.com%2Fcategory%2Fhouse_of_the_dragon&if=false&ts=17337
97470451&sw=1147&sh=745&v=2.9.178&r=stable&ec=0&o=4126&fbp
=fb.1.1733457049005.301331053163141881&ler=empty&cdl=API_u
navailable&it=1733797470430&coo=false&rqm=GET
```

**Load Time**: 13.08 ms
**Pixel Code**: Hide

```
fbq('track', 'PageView')
```

**Pixel Location**: Hide

```
https://www.gruv.com/product/house_of_the_dragon_the_compl
ete_first_season_dvd
```

**Frame**: Window

▶ ✓ ViewContent

1

**Figure #2**




Meta Pixel Helper

Learn More

One pixel found on www.gruv.com



Meta Pixel                                    Troubleshoot Pixel

Pixel ID: 195980562385522 click to copy      Set up events

▶ ✓ PageView

▼ ✓ ViewContent

CUSTOM PARAMETERS SENT

content_name: Hide

   House of the Dragon [DVD]

content_type: product

EVENT INFO

Setup Method: Manual

URL called: Hide

   https://www.facebook.com/tr/?id=195980562385522&ev=ViewCon
   tent&dl=https%3A%2F%2Fwww.gruv.com%2Fproduct%2Fhouse_of_th
   e_dragon_the_complete_first_season_dvd&rl=https%3A%2F%2Fww
   w.gruv.com%2Fcategory%2Fhouse_of_the_dragon&if=false&ts=17
   33797470452&cd[content_type]=product&cd[content_name]=Hous
   e%20of%20the%20Dragon%20%5BDVD%5D&sw=1147&sh=745&v=2.9.178
   &r=stable&ec=1&o=4126&fbp=fb.1.1733457049005.3013310531631
   41881&ler=empty&cdl=API_unavailable&it=1733797470430&coo=f
   alse&rqm=GET

Load Time: 13.33 ms

Pixel Location: Hide

   https://www.gruv.com/product/house_of_the_dragon_the_compl
   ete_first_season_dvd

35.    The information associated with the PageView and ViewContent events transmitted to Facebook, permits an ordinary person to identify a specific individual's video requesting and purchasing behavior.

///

11

36.    When a customer adds a pre-recorded video to his cart (sold on either DVD, Blu-ray, or via a digital video code), the AddToCart event and the Button Click event transmit the title ID ("Title ID") of the requested video, an example of which is shown in Figure #3 below:

**Figure #3**

37.    A visitor who has not logged out of Facebook while requesting a video on Defendant's website will transmit the c_user cookie to Facebook. The c_user cookie contains that visitor's unencrypted Facebook ID ("FID"). When accessing the above video, for example, the Meta Pixel on Defendant's website compels the visitor's browser to send multiple cookies, including the c_user cookie, as shown in Figure #4 below:

**Figure #4**

| Name | ▲ | Value |
|------|---|-------|
| ar_debug | | 1 |
| c_user | | 753829539 |
| datr | | hTAfZmTNp-OhP_gfH51ifP_i |
| dpr | | 1.600000023841858 |
| fr | | 1tEMJ0La6YDNOwu77.AW... |
| ps_n | | 1 |
| sb | | cF8PZCQU3V5lfoPsXLsqD... |
| xs | | 32%3AhjKCD5ciQnHjDA%... |

38.    An FID, along with the title of the prerecorded video requested for purchase, is PII. Anyone can identify a Facebook profile-and all personal information publicly listed on that profile, including a person's first and last name—by appending the FID to the end of Facebook.com. For example, Meta CEO Mark Zuckerberg's FID is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page.

39.    By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Defendant knowingly and intentionally discloses information sufficient for an ordinary person to identify a specific individual's video viewing and purchasing behavior.

40.    When a visitor's browser has recently logged out of Facebook, Defendant's websites compel the browser to send a smaller set of cookies, which are shown in Figure #5 below:

///

**Figure #5**

| Name | ▲ | Value |
|------|---|-------|
| ar_debug | | 1 |
| datr | | hTAfZmTNp-OhP_gfH51ifP_i |
| dpr | | 1.600000023841858 |
| fr | | 1tu6i5lVtgn1sZEgD.AWXE2... |
| ps_n | | 1 |
| sb | | cF8PZCQU3V5lfoPsXLsqD... |

41.    The fr cookie contains, at least, an encrypted FID and browser identifier.[31] The datr cookies also identifies a browser.[32]  Facebook, at a minimum, uses the fr cookies to identify users.[33]

42.    Without a corresponding FID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Upon information and belief, Facebook uses the cookie for targeted advertising.

43.    Facebook, at a minimum, uses the fr and c_user cookies to link FIDs and corresponding Facebook profiles.

**IV.    Plaintiff's Experience with Defendant's Website**

44.    In or about January 2004, Plaintiff created a Facebook account. Plaintiff's Facebook profile includes his first and last name.

45.    In January 2025, Plaintiff purchased prerecorded videos on www.gruv.com.

46.    Plaintiff's default browser is Google Chrome, and he uses Google Chrome to access www.gruv.com.

47.    When Plaintiff requested videos on www.gruv.com, on information and belief, Defendant disclosed to Facebook Plaintiff's FID, browser identifiers, and other identifying

---

[31] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[32] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[33] *Id.*

information along with his event data, which includes the titles of the videos he requested. This event data was transmitted through first-party cookies.

48.     Plaintiff discovered that Defendant's website surreptitiously collected and transmitted his PII in or about January 10, 2025.

**TOLLING OF THE STATUES OF LIMITATIONS**

49.     Each unauthorized transmission of Plaintiff's and other customers' PII by Defendant is a separate unlawful act that triggers anew the relevant statute of limitations.

50.     Additionally, any applicable statutes of limitation have been tolled by: (1) the fraudulent concealment doctrine based on Defendant's knowing and active concealment and denial of the facts alleged herein including but not limited to its incorporation of the tracking pixels; and (2) the delayed discovery doctrine, as Plaintiff and customers did not and could not reasonably have discovered Defendant's conduct alleged herein until shortly before the filing of this Complaint. Plaintiff and customers did not discover and could not reasonably have discovered that Defendant was disclosing and releasing their PII in the ways set forth in this Complaint until shortly before this lawsuit was filed in consultation with counsel.

51.     The Meta Pixel, and other tracking tools on Defendant's website, were and remain entirely invisible to website visitors.

52.     Through no fault of their own or lack of diligence, Plaintiff and other customers were deceived and could not reasonably discover Defendant's unlawful conduct. Defendant's Privacy Policy does not inform Defendant's customers that their PII will be disclosed to unauthorized third parties such as Meta as described in this Complaint.

53.     Plaintiff was therefore ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

54.     Defendant has exclusive knowledge that Defendant's website incorporates the Meta Pixel, and other tracking tools, and the information those pixels and tools are configured to collect and disclose, and yet Defendant failed and continues to fail to disclose to its website visitors, including Plaintiff and other customers, that by interacting with its websites their PII would be disclosed to, released to, or intercepted by Meta.

55.     Under the VPPA, Defendant was and continues to be under a duty to disclose the nature, significance, and consequences of its collection and treatment of website visitors' and customers' PII.  However, to date, Defendant has not conceded, acknowledged, or otherwise indicated to its customers and other website visitors that it disclosed or released their PII to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

56.     Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

## CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action, on behalf of himself and all others similarly situated, under Federal Rules of Civil Procedure, Rule 23, on behalf of the following class (the "Class" or "Class Members"):

> All natural persons in the United States who, while having a Facebook account, purchased a DVD, Blue-ray disc, or digital video code on www.gruv.com.

58.     Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiff's counsel.

59.     Plaintiff reserves the right to revise or amend the above Class definition based on the discovery of new information.

60.     **Numerosity (Rule 23(a)(1)):** The potential members of the proposed Class as defined and identified herein, are, on information and belief, more than one thousand, and so numerous and geographically spread out that joinder of all members of the Class is impracticable.

61.     **Typicality (Rule 23(a)(3)):** Plaintiff 's claims are typical of the claims of the Class. Plaintiff has been a customer of Defendant's website www.gruv.com since January 2025. He used Defendant's website to request and purchase prerecorded videos and, as a result, his PII was disclosed to Meta, without his written consent.

62.    **Commonality (Rule 23(a)(2)):** Common questions of fact and law exist as to all Class Members and predominate over the questions affecting only individual members of the Class. With respect to the Class Members, these common questions include but are not limited to:

(a)    Whether Defendant had Meta Pixels embedded on its website that disclosed Class Members' PII to Meta;

(b)    Whether Defendant is engaged in the business of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio-visual materials" and, thus, is a "video tape service provider" within the meaning of 18 U.S.C. § 2710(a)(4);

(c)    Whether Class Members are "purchaser[s] of goods or services from a video tape service provider" and, thus, are "consumers" within the meaning of 18 U.S.C. § 2710(a)(1);

(d)    Whether Class Members' information was collected, disclosed, and shared by Defendant with unauthorized third parties, including Meta, constitutes PII within the meaning of the Video Privacy Protection Act, 18 U.S.C. §§ 2710 *et seq.*;

(e)    Whether Defendant obtained "informed, written consent" from Class Members within the meaning of 18 U.S.C. § 2710(b)(2)(b);

(f)    Whether Defendant's acts and practices violated the Video Privacy Protection Act, 18 U.S.C. §§ 2710 et seq.;

(g)    Whether the Class is entitled to liquidated damages under 18 U.S.C. § 2710(c)(2)(A), as a result of Defendant's conduct;

(h)    Whether Plaintiff and Class Members are entitled to reasonable attorneys' fees and costs.

63.    **Adequacy of Representation (Rule 23(a)(4))**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with those of the Class, he is not subject to any unique defenses, and has retained competent and experienced counsel that has experience in complex consumer protection class action and cases, as well as sufficient financial and legal resources to prosecute this case on behalf of the Class. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Plaintiff and counsel anticipate no difficulty in managing the litigation of this case as a class action.

64.    **Predominance and Superiority (Rule 23(b)(3)):** In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual members of the Class, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. Here, common issues predominate because liability can be determined on a class-wide basis even if some individualized damages determination may be required. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by complex legal and factual issues of the case to all parties and the court system. Furthermore, the expense and burden of individual litigation make it impossible for Class Members and to individually redress the wrongs done to them and individual Class Members do not have a significant interest in controlling the prosecution of separate actions. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. If this action is not certified as a class action, it will be impossible as a practical matter for many or most Class Members to bring individual actions to recover money from Defendant, due to the relatively small amounts of such individual recoveries relative to the costs and burdens of litigation. Plaintiff anticipates no difficulty in the management of this action which would preclude its maintenance as a class action.

65.    Plaintiff reserves the right to add representatives for the Class, provided Defendant is afforded an opportunity to conduct discovery as to those representatives.

## CAUSE OF ACTION

*Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq.*

66.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

67.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. See generally 18 U.S.C. § 2710.

68.    Defendant is a "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded . . . audiovisual materials." 18 U.S.C. § 2710(a)(4).

69.    Plaintiff and Class Members are "consumers" because they are "purchasers" of Defendant's services, each having purchased a video from the libraries of pre-recorded videos on Defendant's website. 18 U.S.C. § 2710(a)(1).

70.    During the Class Period, Defendant disclosed, "personally identifiable information" of Plaintiff and Class Members to Meta when they clicked on a video title and/or placed a video in their cart on gruv.com, which identified them as "having requested or obtained specific video materials" from Defendant's website, 18 U.S.C. § 2710(a)(3), including, but not limited to, the title and/or identity of every video requested alongside information that would permit an ordinary person to identify them.

71.    Defendant does not seek, let alone receive, "informed, written consent" from Plaintiff, and Class Members pursuant to 18 U.S.C. § 2710(b)(2)(B), and it consequently never provides them the opportunity to withdraw any such consent, 18 U.S.C. § 2710(b)(2)(iii).

72.    Defendant provides Plaintiff's and Class Members' PII to Meta. In particular, Defendant installed, embedded, and/or otherwise permitted the presence of the Meta Pixel on its website and knew that this pixel and tracking tool would gather and disclose the titles of prerecorded videos requested by Plaintiff and Class Members when they clicked on them and/or placed them in their carts.

73.    By knowingly disclosing Plaintiff and Class Members' personal viewing habits, Defendant violates Plaintiff's and Class Members' statutorily protected right to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

74.    As a result of the above-described violations, Defendant is liable to Plaintiff and each Class Member for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages in an amount of $2,500." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Defendant is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief,

and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendant in the future.

75.     Plaintiff, on behalf of himself and the Class, seeks relief as further described below.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for relief and judgement as follows:

76.     An order appointing Plaintiff as the Class Representative;

77.     An order certifying the Class as requested and appointing the undersigned attorneys as Class Counsel;

78.     An order declaring that Defendant's conduct violates the statutes referenced herein;

79.     An order awarding Plaintiff and Class Members actual damages but not less than liquidated damages in an amount of $2,500 per Class Member per violation of the Video Privacy Protection Act, 18 U.S.C. § 2710, et seq;

80.     An injunction forbidding Defendant from disclosing information about users' video viewing choices to third parties pursuant to 18 U.S.C. § 2710(c)(2)(D);

81.     An award of reasonable attorneys' fees and costs of suit, including costs of investigation pursuant to 28 U.S.C § 2710(c)(2)(C);

82.     An award of pre- and post-judgment interest as provided by law; and

83.     An award of such other and further relief, at law and in equity, as the nature of this case may require or as this Court deems just and proper.

///

1

### DEMAND FOR JURY TRIAL

2       Plaintiff, on behalf of himself and all other members of the Class, hereby demands a jury

3    trial on all issues so triable.

4

     Dated: January 16, 2025                    Respectfully submitted,

5

6                                                 /s/ Polina Brandler
                                                JULIAN HAMMOND SBN# 4008397 *(pro hac*
7                                               *vice application forthcoming)*
                                                jhammond@hammondlawpc.com
8                                               POLINA BRANDLER SBN# 4911079
                                                pbrandler@hammondlawpc.com
9                                               HAMMONDLAW, P.C.
                                                1201 Pacific Ave, Suite 600
10                                              Tacoma, WA 98402
                                                (310) 807-1666
11                                              *Attorneys for Plaintiff and the Putative Class*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28